Filed 2/24/23  P. v. Dean CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> TYLER JAMES DEAN et al., <br><br> Defendants and Appellants. | D079225 <br><br><br><br> (Super. Ct. No. SCN358872) |
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> RYAN THOMAS VALDEZ, <br><br> Defendant and Appellant. | D079486 <br><br><br><br> (Super. Ct. No. SCN358872) |

APPEALS from judgments of the Superior Court of San Diego County, Richard R. Monroy, Judge.  Reversed; remanded with directions.

Cynthia Grimm, under appointment by the Court of Appeal, for Defendant and Appellant Tyler James Dean.

Michael Allen, under appointment by the Court of Appeal, for Defendant and Appellant Kevin Garcia.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant Ryan Valdez.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Lynne G. McGinnis, Warren J. Williams, and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Tyler James Dean, Kevin Garcia, and Ryan Thomas Valdez (Dean, Garcia, and Valdez; collectively Appellants) of second degree murder (Pen. Code,[1] § 187, subd. (a)).  The jury also found true a criminal street gang enhancement as to each Appellant (§ 186, subd. (b)(1)).  The trial court found true that Dean had sustained a prior strike conviction (§§ 667, subds. (b)-(i), 1170.12) and served a prior prison term (§ 667.5, subd. b)).  Garcia admitted a prison prior allegation (§ 667.5, subd. b)).

The court sentenced:  (1) Dean to prison for 30 years to life plus a one-year enhancement for the prison prior; (2) Garcia to prison for 15 years to life plus a one-year enhancement for the prison prior; and (3) Valdez to prison for 15 years to life.

Appellants filed timely notices of appeal.  In an unpublished opinion, this court determined that the trial court abused its discretion by failing to notify all 12 jurors of Appellants' request for release of the jurors' personal identifying information.  As such, we conditionally reversed the judgments and remanded the matter to the trial court with instructions to notify the jurors of Appellants' request and to hold a hearing per Code of Civil Procedure, section 237, subdivision (c).  However, we affirmed the judgment

---

[1]     Statutory references are to the Penal Code unless otherwise specified.

2

in all other respects and stated that the trial court could reinstate the judgment if further investigation did not reveal prejudicial juror misconduct. In addition, if the judgment were reinstated, we directed the trial court to correct both Garcia's and Dean's abstracts of judgment to strike the one-year enhancement under section 667.5, subdivision (b), and to clarify on Garcia's abstract of judgment that he was convicted by a jury. (See *People v. Dean et al.* (Sept. 30, 2020, D074371) [nonpub. opn.].)

After remand, the trial court held a hearing under Code of Civil Procedure section 237, subdivision (c) and again denied Appellants' request to disclose the jurors' contact information. The trial court then struck the one-year prison enhancements as to Garcia and Dean but otherwise reinstated the judgments.

Appellants timely appeal, focusing on the following four general claims of error: (1) the trial court erred by not disclosing the jurors' personal information; (2) the trial court prejudicially erred by instructing the jury regarding the natural and probable consequences doctrine; (3) Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Assembly Bill 333) requires the jury's true finding of the gang enhancement to be vacated; and (4) the judgment must be reversed under newly enacted section 1109. In addition, Garcia contends his abstract of judgment must be corrected.

The People correctly concede that the gang enhancement cannot stand in light of Assembly Bill 333. We agree with Appellants and the People as to that issue. In addition, we conclude, in light of Senate Bill No. 775 (2021-2022 Reg. Sess.) (Senate Bill 775), which was enacted after Appellants' trial, the giving of the jury instruction regarding the natural and probable consequences doctrine resulted in prejudicial error. As such, we reverse the judgments and remand the matter to the superior court with instructions to

3

allow the prosecution to retry Appellants consistent with this opinion. Because we are reversing the judgments on the jury instruction and gang enhancement issues, we do not reach the remaining contentions raised by Appellants.[2]

## FACTUAL BACKGROUND[3]

"Hugh P[.] was an African American man in his mid-30's that stood approximately six feet, eight inches tall and weighed approximately 400 pounds. In January 2016, he was staying with his stepmother and a number of other family members in an apartment in Fallbrook.

*"The Assault*

"On the evening of January 22, 2016, another family member, Russell H.,[4] saw [Hugh] at a nearby McDonald's. Russell bought [Hugh] some food and then returned to the apartment while [Hugh] ate. [Hugh] left McDonald's at approximately 10:34 p.m. and began walking back to the apartment alone.

"Around the same time, video surveillance captured three young men arriving in the parking lot of an Albertson's approximately halfway between the McDonald's and the apartment [Hugh] was walking to. The three men

---

[2]    We note Appellants argue that newly added section 1109 applies retroactively and requires reversal of their murder convictions. Because we are reversing the judgments, we need not address this issue. If the prosecution elects to retry Appellants then Appellants may raise whatever section 1109 arguments they deem germane for the superior court's consideration.

[3]    We take the factual background from our previous opinion involving Appellants, *People v. Dean et al.*, *supra*, D074371.

[4]    In accordance with California Rules of Court, rule 8.90(b), we refer to certain individuals by their first name and last initial, and thereafter by their first name only, to protect their privacy. No disrespect is intended.

4

exited the red Honda Civic they were riding in, walked down the street towards [Hugh], ran across the street towards him, assaulted him, and then ran back to the car in the Albertson's parking lot and left.

"[Hugh] managed to return to the apartment and knocked on the door shortly before 11:00 p.m. When the door opened, [Hugh] collapsed onto the floor and said, 'Mom, I'm hurt.' Russell realized [Hugh] was bleeding and [Hugh] asked if he had been stabbed. Russell lifted [Hugh]'s shirt and saw a significant amount of blood around his back and torso. [Hugh]'s stepmother attempted to place pressure on the wounds to stop the bleeding and Russell and [Hugh]'s sister, who was also at the apartment at the time, each called 911.

"[Hugh] told his stepmother that he was 'jumped' and said, '[t]hey didn't want to fight me, Mama,' 'they got me,' and 'I've been stabbed.' She asked who 'they' were, and he told her that they were gang members, that there were three or four of them, and that one of them was wearing a hoodie and one was wearing some sort of face covering. Russell also recalled that [Hugh] said, 'they got me,' that he wanted to just fight but that they did not want to fight, that there were three to five 'eses,' and that they were wearing hoodies and a mask.

"Deputy Sheriff Minami responded to the 911 call at approximately 10:50 p.m. When he arrived, [Hugh] was on his knees, leaning on a chair, yelling, 'Don't let me die.' Deputy Minami immediately began first aid. He asked [Hugh] if he had any problems with anyone in the area and [Hugh] responded that he did not and that he was just walking home when three or four Hispanic men with masks stabbed him. The paramedics arrived and started treating [Hugh]. Deputy Minami stayed at the scene and photographed [Hugh]'s injuries.

*"The Initial Investigation*

"After the paramedics took [Hugh] in an ambulance, Deputy Minami followed the blood trail from the apartment to the Albertson's. Another detective, Jenkins, joined him and took some photographs of the bloodstains. She also collected a receipt, a marijuana pipe, and a coke bottle from the parking lot near where the bloodstains ended. She then returned to the apartment and collected articles of clothing that [Hugh] had been wearing, as well as [Hugh]'s cell phone. At this point, [Hugh] was still alive and, thus, the investigation was treated as an assault investigation.

*"[Hugh]'s Injuries and Resulting Death*

"Deputy Harrell accompanied [Hugh] to the hospital in an ambulance. [Hugh] lost consciousness during the ambulance ride. He arrived at the hospital in a state of shock and was immediately intubated. The attending physician noted four stab wounds in and around [Hugh]'s right lower chest, a larger wound in his left lower abdomen, and smaller wounds on his left flank, left thigh, and left eye. The stab wound in the abdomen caused a hernia that had to be surgically repaired and [Hugh] also had extensive bleeding in his right chest.

"After [Hugh] was taken into surgery, Deputy Harrell encountered a number of family members in the lobby. Russell indicated that [Hugh] had told him he was attacked by five individuals that were approximately 17 or 18 years old.

"The surgeon was able to successfully repair [Hugh]'s hernia, but [Hugh] went into respiratory failure after the surgery. In addition, there was continued bleeding in [Hugh]'s right chest cavity that required additional surgical interventions. Despite these additional interventions, [Hugh] developed further complications, including a serious heart arrhythmia that

6

eventually led to cardiac arrest. On February 9, 2016, [Hugh] died from the culmination of the multiple injuries and related complications.

"An autopsy revealed multiple sharp force injuries, including eight to [Hugh]'s torso and two to his extremities. There were also incisions from a surgery to repair the hernia caused by one of the sharp force injuries to the abdomen. [Hugh] had fluid in his lungs and severe lung damage. The medical examiner concluded that [Hugh] died as a result of the sum total of his injuries and complications that arose from those injuries and ruled the cause of death a homicide.

*"The Subsequent Murder Investigation*

"After [Hugh]'s death, the case became a homicide investigation.

"By that time, detectives had collected video surveillance from the McDonald's, Albertson's, and other nearby businesses, including the footage of the three males running across the street towards [Hugh] just prior to the assault. They identified Garcia and his girlfriend, Jessica V., as being associated with the red Honda Civic that the individuals exited just prior to the assault.

"In addition, Deputy Fomby, a school resource officer in Fallbrook, recognized Valdez from the video surveillance. He obtained video footage from the high school that Valdez attended on the day of the assault. In the video, Valdez is seen wearing a checkered jacket with a grey hood, similar to the one seen in surveillance footage from later that same evening.

"Detectives interviewed Jessica on February 10 and she positively identified Garcia, Dean, and Valdez in photographs from the video surveillance. Detectives located Garcia and Valdez the same day, driving in the red Honda Civic. The car was processed for evidence, and a folding knife was found in the glovebox.

7

"Dean was also contacted that same day. Dean and Garcia were processed by field evidence technicians, including photographs and oral swabs for DNA. Dean had an injury on the inside knuckle of his pinky finger that was photographed. The injury was consistent with a sharp-force trauma and appeared to be partially healed. Valdez was contacted on February 29 and was similarly processed by a field evidence technician.

"Dean was contacted again on the afternoon of March 30, 2016, a mile or two from the scene of the stabbing. Law enforcement conducted a pat-down search and found a butterfly knife in Dean's pocket.

*"DNA Evidence*

"Various members of the San Diego County Sheriff's office also took additional photographs of the blood trail leading up to the apartment where [Hugh] was living and collected swabs from several of the blood stains. The swabs were analyzed for DNA and the DNA was compared to samples from [Hugh], Garcia, Dean, and Valdez. The DNA from two of the swabs matched the DNA profile from Dean. According to the forensic biologist that performed the testing, the probability of randomly selecting a person that would match the DNA profile obtained from the swabs was approximately 1 in 38 quintillion.

"On March 1, 2016, an Albertson's employee found a knife and a lighter on the Albertson's loading dock. The knife was examined for blood stains and fingerprints, but none were found. The knife was swabbed for DNA but there was insufficient DNA to develop a DNA profile.

"The knife from the glove box of the red Honda Civic was also examined for blood stains and fingerprints, but none were found. There was sufficient DNA to develop a partial DNA profile. Dean and Valdez were excluded as

possible contributors. The forensic biologist concluded Garcia could be included as a possible contributor but there was insufficient DNA to be sure.

*"Testimony of Garcia's Girlfriend*

"Jessica testified that she heard others refer to Garcia as 'Maniac' and was aware that he was involved with a Fallbrook gang. However, they had an agreement that they would not discuss anything gang related. She also knew Dean and Valdez as Garcia's friends and knew that Dean went by 'Clear'.

"She testified that she was with Garcia on January 22, 2016. They were driving around most of the day in her vehicle, a red Honda Civic, and she also had her young child in the backseat. At some point in the evening, Garcia asked her to drive to Fallbrook and, once there, they picked up Dean and Valdez.

"After driving around awhile longer, Jessica said that she had to use the restroom, so they stopped at an Albertson's. Garcia, Dean, and Valdez all got out of the car and walked away, and then Jessica got out, took her child out, and took him into Albertson's to use the restroom. Garcia, Dean, and Valdez had not yet returned to the car when she got back. They returned approximately six minutes later. They got into the car and Garcia told Jessica to go.

"Finally, Jessica testified that the knife found in the glove compartment of her car was not hers.

*"Forensic Video Testimony*

"A forensic video analyst, Grant Fredericks, synchronized and reviewed the video footage collected from several different surveillance cameras in the area. He also did a pixel tracking analysis, in which he identified and tracked groupings of pixels associated with specific individuals by identifying

9

the specific tonal values created by a combination of color and brightness. Using this system, Fredericks labeled several unique pixel groups in the video surveillance with white, yellow, red, and green arrows (hereinafter, W, Y, R, and G, respectively).

"Fredericks identified the individual the detectives had previously identified as [Hugh] leaving the McDonald's at approximately 10:34 p.m. and heading towards the Albertson's. He opined that the images of the pixel group he labeled W were consistent with the images of [Hugh].

"In the Albertson's surveillance, he identified pixel groups Y, R, and G exiting a vehicle along with one other unlabeled pixel grouping. He opined that R was wearing clothing that matched the clothing in the video images of Valdez at high school earlier that same day.

"In the video, the unlabeled individual goes towards and eventually enters the Albertson's, while Y, R, and G go in a different direction. Y, R, and G exit the Albertson's surveillance, but three distinct pixel groups with tonal values similar to Y, R, and G are seen on another nearby surveillance camera a minute or two later, at approximately 10:35 p.m. On that video, R continues along the sidewalk, while Y and G go towards the opening of a driveway area. Y and G pixel groups disappear into the darkness and, shortly thereafter, two pixel groups that could not be identified, due to a lack of camera resolution, emerge and follow behind R.

"At approximately 10:43 p.m., three unique pixel groups move across the street towards W and all four move back and forth around one another for approximately two minutes, from 10:43 to 10:45 p.m. Fredericks was then able to identify three of the pixel groups as Y, R, and G again, as they moved closer to the camera and proceeded back towards the Albertson's. At this point, Y, R, and G are seen moving at a higher rate of speed than before and

10

appear. They reappear on the Albertson's surveillance approximately 11 and a half minutes after they left.

"Meanwhile, at approximately 10:39 p.m., the other pixel group that had exited the vehicle with Y, R, and G left Albertson's and returned to the car, consistent with the time on images from inside Albertson's in which Jessica is seen leaving the store with her child.

*"Gang Testimony*

"Deputy Banks testified that he contacted Valdez in July 2013 and Valdez stated that he was trying to become a member of the Varrio Fallbrook Locos gang. In addition, he contacted Dean in February 2016 and Dean stated that he was a member of the Varrio Fallbrook Locos gang and that his moniker was 'Claro.'

"Detective Conard testified regarding 'fresh' graffiti that had recently been discovered in the Varrio Fallbrook Locos gang territory in June 2016. He explained that the graffiti included common references to the Varrio Fallbrook Locos gang, such as 'F' and '13'. It also contained a 'roll call,' which is a reference or intentional grouping of gang member monikers, including 'Blanco,' Valdez's moniker. He identified a racial comment in the graffiti and testified that the Varrio Fallbrook Locos gang was known to have animosity towards African Americans.

"Detective Harris testified there were approximately 115 documented members of the Varrio Fallbrook Locos gang in the spring of 2016. He confirmed that the location of [Hugh]'s assault was within the Varrio Fallbrook Locos gang's territory and explained that the Varrio Fallbrook Locos gang tended to have animosity towards African Americans. In particular, he had been involved in cases in which members of the Varrio Fallbrook Locos gang had targeted African Americans who were not gang

11

members and opined that a large African American male walking in the gang's territory might be perceived as an act of disrespect against the gang. In addition, he was aware of gang members committing opportunistic crimes, such as attacking a perceived rival seen walking through the gang's territory without having a preconceived plan, and that there would be a perceived benefit to the gang if gang members were to kill an African American in the gang's territory. Finally, based on the totality of the evidence and his training and experience, Harris opined that Dean, Garcia, and Valdez were all members of the Varrio Fallbrook Locos gang.

*"Defense*

"James Stam, an independent criminalist, conducted his own investigation of the scene of the assault and also reviewed the photographs and evidence submitted by the prosecution. He pointed out a number of errors in the way the blood trail was originally documented and opined that he would have expected to see more significant blood stains on the ground near the area where the prosecution asserted [Hugh] was stabbed.

"[Hugh]'s sister testified that [Hugh] said he was stabbed by 'eses,' that they were wearing dark colors and masks, and that there were two or three of them. She also recalled that [Hugh] said it happened in a parking lot. During an interview with a detective in the days following the result, which was played for the jury, she explained that the Fallbrook Locos were known to hang out in front of the apartment and also in the Albertson's parking lot.

"None of the defendants testified."

DISCUSSION

I

NATURAL AND PROBABLE CONSEQUENCES DOCTRINE

A.  Appellants' Contentions

In their first appeal, Appellants maintained that their convictions for second-degree murder should be reversed because the jury was instructed on the natural and probable consequences doctrine.  We rejected their argument, concluding that Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) required Appellants to pursue this claim through the petition procedure contained in the law.  (*People v. Dean et al.*, *supra*, D074371.)  However, while this case was pending on remand, Senate Bill 775 was enacted, which allows individuals to challenge their murder convictions based on the natural and probable consequences doctrine on appeal.

Thus, Appellants contend that their respective convictions for second-degree murder should be reversed because the jury was instructed on the now invalid natural and probable consequences theory.

B.  Background

In accordance with the law in effect at the time, Appellants' jury was instructed that they could be found guilty of murder under three different theories:  as the actual perpetrator (CALCRIM No. 400); as a direct aider and abettor (CALCRIM No. 401); and under the natural and probable consequences doctrine (CALCRIM No. 403).  As to the last theory, the jury was instructed, in pertinent part, as follows:

> "Before you may decide whether any defendant is guilty of
> murder you must decide whether he is guilty of assault
> with deadly weapon or with force likely to cause great
> bodily injury, simple assault, battery causing bodily injury
> or simple battery.

13

"To prove that the defendant is guilty of murder, the People must prove that:

"1.  The defendant is guilty of assault with deadly weapon or with force likely to cause great bodily injury, simple assault, battery causing bodily injury or simple battery.

"2.  During the commission of assault with deadly weapon or with force likely to cause great bodily injury, simple assault, battery causing bodily injury or simple battery a co-participant in that assault with deadly weapon or with force likely to cause great bodily injury, simple assault, battery causing bodily injury or simply battery committed the crime of murder;

"AND

"3.  Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of the murder was a natural and probable consequence of the commission of the assault with deadly weapon or with force likely to cause great bodily injury, simple assault, battery causing bodily injury or simple battery.

"[¶] . . . [¶]

"*A natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence."

During closing argument, the prosecutor argued all three theories. Initially, the prosecutor defined murder and said that while malice aforethought did not mean hatred or ill-will, both were present during the killing of Hugh.  The fact that Appellants stabbed Hugh "over and over again" demonstrated implied malice murder.  The prosecutor told the jurors that there were two theories of liability—direct perpetrator, meaning the person who commits the act, and aiding and abetting, which could consist of

14

two different types of actions.  Nevertheless, the prosecutor first focused on a direct perpetrator theory.

The prosecutor then explained that a direct perpetrator committed the stabbing, and there could be more than one direct perpetrator of an act.  The prosecutor argued in detail why the evidence showed that Dean and Garcia were both guilty of murder as direct perpetrators.  Specifically, she explained:

> "In this case, there's evidence beyond a reasonable doubt that Tyler Dean is guilty of murder as a direct perpetrator. Dean is one of the three people on video attacking [Hugh]. Those who attacked with a knife in multiple stabbing situations often end up injuring themselves as the knife slips in the blood.
>
> "Dean had a healing cut on the inside of the knuckle of his right pinkie finger.  Mr. Dean is right-handed.  You've seen him writing throughout the trial.  Mr. Dean left his blood at the crime scene.  Mr. Dean's DNA is an overwhelming match, greater than the population of the planet.  Mr. Dean was found with a knife in his possession just a few weeks after the murder.  Mr. Dean acted with implied malice when he stabbed [Hugh] over and over again; that is, he intentionally did an act that he knew was dangerous to human life, and he did it anyway.
>
> "Likewise, there's evidence beyond a reasonable doubt that Kevin Garcia is guilty of murder as a direct perpetrator. He, too, attacked [Hugh] in the dark.  The location of the multiple stab wounds to both sides of [Hugh]'s body and the swarming manner that you see on the video, the way the defendants had attacked him, is consistent with more than one stabber.  And like Mr. Dean, Kevin Garcia was found in possession of a knife about two weeks after the murder, in the glove box of that red car that was used the night of the attack.
>
> "The medical examiner indicated that both of those knives, that butterfly knife that Dean had and that folding knife that Garcia had, are consistent with the type of instrument that would cause the injuries that killed [Hugh].  Mr.

15

Garcia, too, intentionally did an act that he knew was dangerous to human life, and he did it anyway. Direct perpetrator did the act."

The prosecutor then described how the evidence established that Valdez was guilty of murder as a direct aider and abettor. To this end, she stated:

> "There is evidence beyond a reasonable doubt in this case that Ryan Valdez is guilty of murder as a direct aider and abettor. Mr. Valdez attacked [Hugh] at the same time, in the same manner, right along with his fellow gang members for the same hateful gang reason. By continuing to attack him and preventing him from leaving or being able to defend himself, Mr. Valdez directly aided and abetted Dean and Garcia, who were stabbing him.
>
> "Given the number and nature of the stab wounds and the close proximity of everyone involved in that attack, it is more than reasonable to conclude that Mr. Valdez, indeed, had knowledge of Valdez—I'm sorry—of Mr. Dean and Mr. Garcia stabbing [Hugh] and stabbing him over and over again. And he helped them do that by participating in that attack."

Next, the prosecutor said the other method of aiding and abetting was the natural and probable consequences theory. She explained:

> "In a nutshell, natural probable consequences theory of aiding and abetting tells you that all principals, both direct perpetrators and aiders and abettors are guilty of all crimes. We call them nontarget crimes. All crimes that are natural and probable consequences of the original, we call it a target crime.
>
> "There's evidence beyond a reasonable doubt that each of these defendants is guilty of murder under a natural and probable consequences method of aiding and abetting. It's important to remember that under this aiding and abetting theory, you don't need to know who committed the act.

16

"Under direct perpetrator, I suggest to you, for example, Tyler Dean committed the stabbing, given the other evidence. But under natural probable consequences theory, often, it's unclear who commits the killing event, but if the killing is a natural and probable consequence of the crime that everybody is involved in, that it will lead to it, and one of them a co-participant, someone ends up killing somebody and that's reasonably foreseeable to occur, that that's reasonable in light of all the circumstances and reasonable in light of the defendant's point of view and where he comes from, then everyone is guilty for all of the crimes that ensue. That happens very often in gang cases and attacks and murders like this one."

The prosecutor then defined the target offenses and argued how the evidence showed that each Appellant was guilty of murder under the natural and probable consequences theory. The prosecutor summed it up by telling the jury that there were two theories of liability: direct perpetrator and aider and abettor, and that they did not have to agree on the theory of liability for murder, but they did have to agree that murder was committed.

In response, each of the Appellants' respective lawyers argued a lack of proof during their closing arguments. In addition, they maintained that it was not Appellants who stabbed the victim, but someone else. To this end, Dean's counsel observed that a video capturing an altercation between Appellants and the victim did not show any of the Appellants stabbing the victim or holding a weapon. She also emphasized that Hugh stated that he was stabbed in a parking lot and there was "large amounts of blood" in the parking lot of the apartment complex, which was not where the video showed the altercation involving Appellants.

During his closing argument, Valdez's counsel focused on "three critical pieces of evidence" consisting of the video, the physical evidence, and Hugh's statements. He argued that the video showed that Hugh walked away from

17

the fight with Appellants with no apparent signs that he was stabbed. Regarding the physical evidence, Valdez's counsel pointed out that there was no evidence of a blood trail from where Appellants encountered the victim to the victim's apartment. Additionally, he highlighted Hugh's statements after he was stabbed and reached the apartment where Hugh stated he was attacked by five Hispanic males, three wearing hooded sweatshirts, and two with masks.

Garcia's counsel echoed what the other Appellants' counsel argued during closing. To this end, he noted that his client did not match the description Hugh provided and was not wearing a mask. Further, he emphasized that the victim stated the stabbing took place in a parking lot, away from where Appellants encountered Hugh. And Garcia's counsel argued that the physical evidence did not implicate Garcia or the other Appellants.

In her rebuttal closing argument, the prosecutor reviewed the evidence, arguing that it pointed to Appellants stabbing Hugh. She did not discuss the probable consequences doctrine.

### C. Relevant Law

Before Senate Bill 1437, the natural and probable consequences doctrine provided that a person who knowingly aided and abetted criminal conduct was guilty of not only the intended crime (known as the target offense), but also of the so-called nontarget offense, meaning any other crime the perpetrator actually committed that was a natural and probable consequence of the intended crime. (*People v. Medina* (2009) 46 Cal.4th 913, 920 (*Medina*).) "Thus, for example, if a person aid[ed] and abet[ted] only an intended assault, but a murder result[ed], that person [could] be guilty of that murder, even if unintended, if it [wa]s a natural and probable

18

consequence of the intended assault." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.)

A nontarget offense was a "natural and probable consequence" of the target offense when, judged objectively, it was reasonably foreseeable. (*Medina, supra*, 46 Cal.4th at p. 920.)  It did not matter whether the aider and abettor actually foresaw or intended the nontarget offense.  Instead, liability was measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.  (*Ibid*.)

However, Senate Bill 1437 limited accomplice liability under the felony-murder rule and eliminated the natural and probable consequences doctrine as it relates to murder.  (*People v. Lewis* (2021) 11 Cal.5th 952, 957, 959; *People v. Gentile* (2020) 10 Cal.5th 830, 842-843 (*Gentile*).)  To achieve these goals, Senate Bill 1437 added section 189, subdivision (e) (limiting application of the felony-murder rule) and section 188, subdivision (a)(3) (stating that "[m]alice shall not be imputed to a person based solely on his or her participation in a crime.")  As amended, section 188 "bars a conviction for first or second degree murder under a natural and probable consequences theory." (*Gentile*, at p. 846.)  Senate Bill 1437 also added section 1172.6 (formerly section 1170.95),[5] which created a procedure whereby persons convicted of murder under a now-invalid felony-murder or natural and probable consequences theory may petition for vacation of their convictions and resentencing.

After trial and this court's previous opinion in this case, Senate Bill 775 changed the law in several respects.  One is relevant here.  Senate Bill 775

---

[5]     Assembly Bill No. 200 (Stats. 2022, ch. 58, § 10) renumbered section 1170.95 to 1172.6, effective June 30, 2022.

added subdivision (g) to section 1172.6. That subdivision provides, "A person convicted of murder, attempted murder, or manslaughter whose conviction is not final may challenge on direct appeal the validity of that conviction based on the changes made to Sections 188 and 189 by Senate Bill 1437." Subdivision (g) supersedes *Gentile*'s holding that Senate Bill 1437's ameliorative provisions do not apply on direct appeal (see *Gentile*, *supra*, 10 Cal.5th at p. 839), and allows Appellants to challenge the validity of their convictions under the amended law in this appeal. (See *People v. Hola* (2022) 77 Cal.App.5th 362, 369-370; *People v. Glukhoy* (2022) 77 Cal.App.5th 576, 584, review granted July 27, 2022, S274792 (*Glukhoy*).)

Under *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*) at pages 745 to 746, we assume that, absent contrary evidence, an amendment reducing punishment for a crime applies retroactively to all nonfinal judgments. (See *People v. Brown* (2012) 54 Cal.4th 314, 323 (*Brown*); *People v. Garcia* (2018) 28 Cal.App.5th 961, 973.) Such is the case with Senate Bill 775. (*People v. Montes* (2021) 71 Cal.App.5th 1001, 1006-1007.) For retroactivity purposes, a judgment is not final until the time for petitioning for a writ of certiorari in the United States Supreme Court has passed. (*People v. Vieira* (2005) 35 Cal.4th 264, 306.) Appellants' direct appeal was not final when Senate Bill 775 took effect, and therefore the amendments apply retroactively to them.

### D. Analysis

As our discussion of Senate Bills 1437 and 775 makes clear, instruction on the natural and probable consequences doctrine was improper under the amended law. We turn, then, to the question of prejudice.

"When a trial court instructs the jury on alternative theories of guilt and at least one of those theories is legally erroneous at the time it was given,

20

we normally assess whether the error was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24." (*Gentile, supra,* 10 Cal.5th at p. 851; *People v. Aledamat* (2019) 8 Cal.5th 1, 3 (*Aledamat*).) We "must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, [we] determine[ ] the error was harmless beyond a reasonable doubt." (*Aledamat,* at p. 3.)

In *Aledamat*, our Supreme Court "rejected a more demanding standard of review . . . that would have required the court to examine the verdict and the record and to find evidence in the record to support a determination, beyond a reasonable doubt, that the jury actually relied on the valid, not the invalid, theory." (*People v. Thompkins* (2020) 50 Cal.App.5th 365, 399 (*Thompkins*); see *Glukhoy, supra,* 77 Cal.App.5th at pp. 592-593, review granted; *People v. Stringer* (2019) 41 Cal.App.5th 974, 984.) The court in *Aledamat* concluded, "no higher standard of review applies to alternative-theory error than applies to other misdescriptions of the elements. The same beyond a reasonable doubt standard applies to all such misdescriptions, including alternative-theory error." (*Aledamat, supra,* 8 Cal.5th at p. 9.) "It is enough if we can say, beyond a reasonable doubt, the legally inadequate theory did not contribute to the verdict." (*Thompkins,* at p. 399.)

Additionally in *Aledamat*, our high court suggested various nonexclusive methods of evaluating prejudice. "An examination of the actual verdict may be sufficient to demonstrate harmlessness, but it is not necessary." (*Aledamat, supra,* 8 Cal.5th at p. 13.) The reviewing court may examine "what the jury necessarily did find" and consider "whether it would be impossible, on the evidence, for the jury to find *that* without *also* finding the missing fact as well." (*Id.* at p. 15, citing *California v. Roy* (1996)

21

519 U.S. 2, 7 (conc. opn. of Scalia, J.).) Circumstances that may factor into the prejudice calculus include the parties' arguments, questions posed by the jury, and the instructions as a whole. (*Aledamat*, at pp. 12, 13-14; *People v. Baratang* (2020) 56 Cal.App.5th 252, 263.)

Here, the People maintain that "[a]lthough the prosecutor relied on both valid and now invalid theories of liability, it is evident beyond a reasonable doubt that the natural and probable consequences doctrine did not affect the verdict given the very strong evidence of [A]ppellants' mental states." To this end, the People point to evidence that Appellants targeted Hugh because he was an African-American man walking through their gang territory; Appellants had motive to kill the victim based on the animosity and hatred of their gang against African-Americans; all three Appellants targeted Hugh as they physically attacked and stabbed him; Appellants used their superior numbers to punch and stab Hugh; and, as the gang expert testified, gang members back each other up and they do not back down.

Ironically, the People's arguments here underscore the importance of the natural and probable consequences doctrine for the prosecution's case against Appellants. Notably, the People do not point to any evidence that establishes who actually stabbed the victim or each Appellant's role in the altercation. Rather, the People emphasize that Appellants are gang members, Hugh was walking through Appellants' gang's territory, and Appellants acted consistently with their gang affiliation by attacking, stabbing, and ultimately killing Hugh. In this sense, the People's argument here mirrors the prosecutor's theory of the case at trial as well as her closing argument. Indeed, the prosecutor began her closing argument as follows: "Weeks ago in his opening statement, [Garcia's counsel] emphatically told you that this is not a gang case. *It is a gang case*." (italics added.) She then

22

explained to the jury that Hugh "would be here today" if not for the fact that Appellants were gang members and acted consistent with the values of their gang. After which, she repeated, "This is a gang case."

Considering the prosecutor's framing of this matter as a "gang case," it is not surprising that she emphasized to the jury the importance of the natural and probable consequences doctrine, highlighting that doctrine is often used in murders involving gang members: "That happens very often in gang cases and attacks and murders like this one." Additionally, the prosecutor informed the jurors that under the natural and probable consequences doctrine, they "don't need to know who committed the [criminal] act." And after discussing the natural and probable consequences during her closing, the prosecutor spent considerable time reviewing the gang evidence to establish Appellants were guilty under the natural and probable consequences doctrine. Finally, toward the conclusion of her closing argument, the prosecutor emphasized, multiple times, the jury did not have to agree on the same theory to find Appellants guilty of murder.

Based upon our review of the record, it is clear the prosecutor relied heavily on the natural and probable consequences doctrine. We do not fault her for doing so. At the time of the trial, the natural and probable consequences doctrine was a valid theory under which to convict a defendant for murder. The prosecutor's strategy and theory were both sound under the law as it existed then. However, the Legislature changed the law, establishing that the natural and probable consequences doctrine cannot be used to find a defendant guilty of murder.

On the record before us, we cannot say, beyond a reasonable doubt, the legally inadequate theory did not contribute to the verdict. (*Thompkins*, *supra*, 50 Cal.App.5th at p. 399.) The jury was provided with a natural and

23

probable consequences doctrine instruction, and the prosecution argued that the jury could convict Appellants under that theory. Accordingly, the murder convictions cannot stand.

Yet, where, as here, a defendant secures a reversal on appeal of his or her conviction due to trial error other than insufficiency of the evidence, the defendant is subject to retrial. (*People v. Hernandez* (2003) 30 Cal.4th 1, 6; see *In re D.N.* (2018) 19 Cal.App.5th 898, 902 ["Double jeopardy forbids retrial after a reversal due to insufficient evidence to support the verdict. [But] [w]here the prosecution makes its case under the law as it stood at trial, double jeopardy is not implicated as it would otherwise be where there is evidentiary insufficiency"].) Thus, after remand, the prosecution has the option to retry Appellants on the murder charge.

II

ASSEMBLY BILL 333

A. Appellants' Contentions

Appellants contend, and the People concede, that Assembly Bill 333 mandates that their gang enhancement be vacated and the matter remanded to the trial court to allow the prosecution to retry Appellants on that enhancement. We agree.

## B. Relevant Law

Assembly Bill 333 became effective on January 1, 2022. (Stats. 2021, ch. 699, § 3, eff. Jan. 1, 2022.) Among other things, it amended section 186.22 to impose additional elements necessary to prove the substantive crime of active participation in a criminal street gang in subdivision (a) and, as relevant here, the related gang sentencing enhancement allegation in subdivision (b).

The Legislature first enacted section 186.22 as part of the "California Street Terrorism Enforcement and Prevention Act" (the STEP Act) in 1988. (Assem. Bill No. 2013 (1987-1988 Reg. Sess.) Cal. Legis. Serv., ch. 1242; § 186.20 et seq.) The purpose of the STEP Act was to "make the commission of criminal offenses by individuals who are members of street gangs a separate and distinctly punished offense." (*Ibid*., emphasis omitted.) Pertinent here, subdivision (a) of section 186.22 makes active participation in a criminal street gang a substantive crime and subdivision (b) sets forth various sentencing enhancements for persons convicted of felonies committed for the benefit of, at the direction of, or in association with a criminal street gang.

Assembly Bill 333 made several important changes to section 186.22. First, Assembly Bill 333 amended the statutory definition of what constitutes a " 'pattern of criminal gang activity,' " under section 186.22, subdivision (e). Section 186.22, former subdivision (e), defined " 'pattern of criminal gang activity' [as] the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of [33 enumerated] offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were

committed on separate occasions, or by two or more persons." Following Assembly Bill 333, the definition now requires that "the last of those offenses occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed." (§ 186.22, subd. (e)(1).) The definition also now requires that "the offenses commonly benefited a criminal street gang, and the common benefit of the offense is more than reputational." (*Ibid*.)

Second, Assembly Bill 333 added subdivision (e)(2), which provides, "[t]he currently charged offense shall not be used to establish the pattern of criminal gang activity." (§ 186.22, subd. (e)(2).)

Third, Assembly Bill 333 amended section 186.22, subdivision (f). That subdivision previously defined " 'criminal street gang' [as] any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in . . . subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, former subd. (f).) The definition now requires "an ongoing, organized association, or group of three or more persons." (§ 186.22, subd. (f).) The word "individually" was removed, now requiring the members to "collectively engage" in a pattern of criminal gang activity. (*Ibid*.)

Finally, Assembly Bill 333 added section 186.22, subdivision (g), which provides: "As used in this chapter, to benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational. Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or

26

intimidation or silencing of a potential current or previous witness or informant."

### C. Analysis

The People concede the amendments to section 186.22 apply retroactively to Appellants and require that we vacate the gang enhancement under section 186.22, subdivision (b). We agree.

Under the *Estrada* rule, we presume, absent evidence to the contrary, that statutes that reduce punishment for criminal conduct apply retroactively to all defendants whose sentences are not final on the statute's operative date. (See *People v. Frahs* (2020) 9 Cal.5th 618, 624-626; *Brown, supra*, 54 Cal.4th at p. 323; *Estrada, supra*, 63 Cal.2d at pp. 742-745.) As our high court has recently concluded, by increasing the threshold requirements of a conviction on the active gang participation offense and the gang enhancement allegation pursuant to section 186.22, subdivisions (a) and (b)(5), respectively, Assembly Bill 333 is ameliorative on some sentences and is therefore retroactive under the *Estrada* rule. (See *People v. Tran* (2022) 13 Cal.5th 1169, 1207 (*Tran*); accord *People v. Lopez* (2021) 73 Cal.App.5th 327, 344 (*Lopez*) [concluding the amendments to section 186.22 implemented by Assembly Bill 333 are retroactive because they "increase[ ] the threshold for conviction of the section 186.22 offense and the imposition of the enhancement"].)

The prosecution alleged that each Appellant committed murder charged in count 1 for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote further, or assist in any criminal conduct by gang members in violation of section 186.22, subdivision (b)(1). The prosecution introduced evidence of three predicate acts to prove the gang enhancement: (1) Varrio Fallbrook Locos member

Salvador Lopez pled guilty to committing voluntary manslaughter on January 11, 2011, and to being an accessory after the fact, and he admitted the gang enhancement allegations; (2) Varrio Fallbrook Locos member Christopher Flores committed attempted murder for the benefit of a criminal street gang on May 30, 2013; and (3) Varrio Fallbrook Locos member Sergio Ramirez committed attempted murder for the benefit of a criminal street gang on January 3, 2013.

Obviously, the prosecution was not required to prove the additional elements later implemented by the statutory amendments under Assembly Bill 333. And although the trial court instructed the jury pursuant to the former requirements of section 186.22, it also told the jurors that they could consider the currently charged crimes in determining whether the prosecution had proven the pattern of criminal activity. Yet, after Appellants' trial, Assembly Bill 333 changed the law to disallow consideration of the charged offenses when deciding whether the prosecution has proven the pattern of criminal activity.

Consequently, the true finding on the gang enhancement pursuant to section 186.22, subdivision (b)(1) as to each Appellant must be reversed. (See, e.g., *Tran, supra*, 13 Cal.5th at p. 1207 [concluding "reversal of the gang enhancement is required" where "the jury was not presented with any discernible theory as to how [gang] members 'collectively engage[d] in' these predicate crimes" as required by amended section 186.22, subdivision (f)].) On remand, the People shall be afforded the opportunity to retry Appellants per section 186.22, subdivision (b)(1), as amended by Assembly Bill 333. (See *Lopez, supra*, 73 Cal.App.5th at p. 346; cf *People v. Eagle* (2016) 246 Cal.App.4th 275, 280 ["When a statutory amendment adds an additional element to an offense, the prosecution must be afforded the opportunity to

establish the additional element[s] upon remand.  [Citation.]  Such a retrial is not barred by the double jeopardy clause or ex post facto principles because the [additional elements were] not relevant to the charges at the time of trial and accordingly, [the issue] was never tried."].)

## DISPOSITION

Appellants' convictions for murder and the jury's true findings on the gang enhancement are reversed.  The prosecution may retry Appellants on the murder count as well as the gang enhancement consistent with this opinion and existing law.

HUFFMAN, Acting P. J.

WE CONCUR:

IRION, J.

DO, J.